GENERAL TELEPHONE COMPANY of the Southwest
*v.* ARKANSAS PUBLIC SERVICE COMMISSION

88-27                                           751 S.W.2d 1

Supreme Court of Arkansas
Opinion delivered May 31, 1988
[Rehearing denied July 5, 1988.]

*William G. Mundy; William H. Ballard*; and *Mitchell, Williams, Selig, Jackson & Tucker*, by: *Kent Foster*, and *Michael O'Malley*, for petitioner.

*Ivester, Henry, Skinner & Camp, A Professional Corporation*, by: *Herman Ivester*, and of counsel: *Richard C. Hartgrove* and *Garry S. Wann*, for amici curiae ALLTEL Arkansas, Inc. and Southwestern Bell Telephone Company.

*Gilbert L. Glover* and *Art Stuenkel*, for respondent.

DAVID NEWBERN, Justice. General Telephone Company of

the Southwest (company) petitioned the Arkansas Public Service Commission (commission) for a rate increase which would have produced $6,410,615 in new revenue. The commission approved an increase of $809,001. Upon rehearing, the amount was reduced to $159,165. In *General Telephone Company v. Arkansas Public Service Commission*, 23 Ark. App. 73, 744 S.W.2d 392 (1988), the Arkansas Court of Appeals affirmed the commission in all respects, and this court granted certiorari upon the company's request that we review matters in the court of appeals' decision which are of legal significance and public interest. The company contends the court of appeals erred in finding it was not improper for the commission to have used an evaluation procedure called the "modified balance sheet approach" to determine working capital needed by the company. It is also contended that the court erred in approving the commission's consideration of savings which would accrue to the company in the future and not during the limited time required by statute to be used as a sample or test period to evaluate the need for additional revenue. Finally, the company contends the court erred in permitting the reduction on rehearing to stand because the rehearing had been sought by the commission staff (staff) which lacked standing to request rehearing. We hold that the use of the modified balance sheet approach to determine working capital is not confiscatory, that the commission's consideration of savings to be achieved in the future was permissible because the changes which would bring them about were implemented during the statutory period, and that the company was not unfairly prejudiced by the rehearing at the instance of the commission staff. The decision of the court of appeals is affirmed.

### 1. Methods of determining the need for higher rates

#### a. Working capital and "return on return"

One of the assets needed by a utility to provide service is cash working capital. It needs enough money to be able to pay the costs of providing service to the consumers during the time it must wait for the consumers to pay for the services. The company presented to the commission a study which figured the value of its needed working capital on the basis of its entitlement to the amount the consumers would pay for the services, and it asserted it was entitled to a return (comparable to interest or profit) on that asset just as on any other asset of the company. The commission staff had prepared a study in which the amount of working capital was

figured on the basis of the company's entitlement to consider the cost of providing the service, rather than the price of the service to the consumers, as an element of working capital. The staff's study thus showed an asset substantially smaller than the company's study. The effect of using the staff approach was to allow the company a return on a smaller asset. The company argues that was improper because it is entitled to a return on that which it has coming, *i.e.*, the price of the service. The commission argues the company is entitled only to a return on an element of working capital determined by the cost to the company of providing the service.

In a hearing before the commission, the staff presented testimony showing that the study done by the company was erroneous in several respects and that the staff had attempted to work with it but found it impossible to make the corrections needed in time to use the company figures in the hearing. The staff therefore presented its study, and the commission based the result it reached on the staff study. The modified balance sheet approach was thus used by the commission, allowing the company a return on the working capital asset calculated using the cost of providing services rather than the price to be received.

### b. "Fungible" liabilities

The other major complaint of the company with respect to the result based on the staff study and the modified balance sheet approach is that it treats all liabilities the same. The company contends it is obvious that some liabilities, such as long-term debt to investors, produce revenue and others, such as money owed for depreciable assets, such as telephone poles, do not. The company's position is that the staff's approach thus presents an inaccurate picture of the company's condition. The company argues that it is wrong to treat all liabilities as "fungible." The company's point is that it is entitled to a return on its investors' money which is a liability in the sense that it is money owed to stockholders or bond purchasers. When such a liability is lumped on one side of a balance sheet with other liabilities, such as, for example, accounts payable, sight of the need for a return on the revenue producing liabilities is lost. A fund-generating liability, such as long-term debt to investors, thus may appear to have a cost of zero which the company contends is inaccurate, gives a

distorted view of the need for working capital, and leads to establishment of a rate which confiscates its property.

█ The statute pursuant to which the court of appeals reviews the actions of the commission, Ark. Code Ann. § 23-2-423(c)(3), (4), and (5) (1987), limits the review as follows:

> (3) The finding of the commission as to the facts, if supported by substantial evidence, shall be conclusive.

> (4) The review shall not be extended further than to determine whether the commission's findings are supported by substantial evidence and whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violated any right of the petitioner under the laws or Constitution of the United States or of the State of Arkansas.

> (5) All evidence before the commission shall be considered by the court regardless of any technical rule which might have rendered the evidence inadmissible if originally offered in the trial of any action at law or in equity.

The court of appeals held that the commission's decision on the amount of increase in revenues for the company was supported by substantial evidence. *General Telephone Company of the Southwest* v. *Arkansas Public Service Commission*, 23 Ark. App. 73, 744 S.W.2d 392 (1988). The company's argument here is that the method used by the commission and approved by the court of appeals was so inaccurate and improper that it amounted to confiscation of its property.

█ As we understand it, the approach taken by the commission was based upon an accountant's long-range evaluation of the company's needs using a balance sheet rather than the day-to-day cash flow analysis urged by the company. While we would reverse a decision where confiscatory rate making was evident, *Public Service Comm'n* v. *Continental Tel. Co.*, 262 Ark. 821, 561 S.W.2d 645 (1978); *Chicago M. St. P. Ry. Co.* v. *Minnesota ex rel. Railroad & Warehouse Comm.*, 134 U.S. 418 (1890), we are not concerned with the method the commission used, and the court of appeals approved, to determine the rate needed to supply

the company adequately with working capital. *General Tel. Co. v. Arkansas Public Service Comm'n*, 272 Ark. 440, 616 S.W.2d 1 (1981). The only cited exception to this general rule that we do not evaluate methods occurred in *Acme Brick Co. v. Arkansas Public Service Comm'n*, 227 Ark. 436, 299 S.W.2d 208 (1957). There we held that the commission could not discard means which evaluated the company and its needs for something called a "fair field price" method. We have no such departure from traditional public utility rate-making before us in this case.

■ The company has accurately demonstrated that the method used by the commission is different from the one it proposed, but it has not demonstrated that the commission's approach resulted in such a small increase in revenues that its property was confiscated. We accept the company's argument that the method it proposed is the favored one and has been used far more often than the modified balance sheet approach. While the modified balance sheet approach has not been the subject of a previous Arkansas appellate court decision, it has previously been used and discussed in a published opinion by the commission. *Re Arkansas Power & Light Co.*, 66 PUR 4th 167 (1985). The fact that it is a relatively new method of accounting does not mean that it reaches a necessarily confiscatory result.

■ The court of appeals correctly deferred to the expertise of the commission once it was determined that the commission's factual determinations were demonstrated to be supported by substantial evidence. *Southwestern Bell Tel. Co. v. Arkansas Public Service Comm'n*, 267 Ark. 550, 593 S.W.2d 434 (1980). As long as the decision falls within the "zone of reasonableness" we cannot find it was confiscatory. *Public Service Comm'n v. Continental Tel. Co., supra.* While the company has demonstrated some comparative deficiencies in the modified balance sheet approach, it has not shown that those deficiencies are not otherwise compensated for in the result reached or that the revenue increase received was so unreasonable as to be confiscatory.

### 2. Savings outside the test period

■ When a utility appears before the commission to seek a rate increase, it may present data based on its experience during a test period of twelve consecutive months, or it may use experience

data from a six-month period along with projections for another six months. Ark. Code Ann. § 23-4-406 (1987). The statute also provides, in part:

> However, the commission shall also permit adjustments to any test year so utilized to reflect the effects on an annualized basis of any and all changes in circumstances which may occur within twelve (12) months after the end of the test year where such changes are both reasonably known and measurable.

The company chose 1984 as its test year. During 1985 the company instituted a number of efficiency programs designed to save expenses in providing service to the rate payers. The commission used its information about these programs, which were instituted in 1985, to determine the company's need for additional revenues was not as great as it might otherwise have been. The company argues that it was error to use this information because the savings were, for the most part, not to be realized until after 1985.

We have only to read the language quoted from the statute to decide that the commission did not abuse its powers in this respect. The "changes in circumstances" were "reasonably known and measurable," and they occurred during twelve months after the test year.

### 3. Staff standing

The company argues that it was improper for the commission to allow its staff to seek the rehearing of its order which resulted in the reduction of the amount of new revenue it was to allow the company. The statute governing rehearings before the commission, Ark. Code Ann. § 23-2-422 (1987), provides, in subsection (a), that application for rehearing may be made by "[a]ny party . . . aggrieved by an order issued by the commission." The commission argues it has the power to make rules and that it has, by its Rule 1.05, provided that its staff is to be bound by the commission's rules as a party. In the first order issued in this case, the commission designated the staff as a party. The commission argues that the company waived its right to object to the staff being treated as a party before it by not raising the issue until it filed its motion to dismiss the staff's rehearing

application.

A quick look at the statutes providing for rate hearings before the commission shows the commission to be, without doubt, a quasi-judicial body. *See* Ark. Code Ann. §§ 23-2-401 through 23-4-424 (1987 and Supp. 1987). It is troublesome that an agency which is placed in a decision-making role can have its own staff before it as a party. Even if the internal operating procedures of the commission kept the commissioners totally isolated from their staff, and we assume that is not the case, we would find a serious appearance of impropriety in this situation. It is a little like a judge making his or her law clerk a party to a case even though the law clerk has a close association with the judge, is his or her employee, and has the judge's ear before and after the hearing.

We have real doubts about this situation, especially now that the Arkansas Attorney General may represent the public interest in these cases, Ark. Code Ann. § 23-4-305 (1987). In this case, however, we find no specific, unfair prejudice in permitting the staff to ask for rehearing. Arkansas Code Ann. § 23-2-426(a) (1987) provides: "The commission may at any time, and from time to time, after notice, and after opportunity to be heard as provided in the case of complaints, rescind or amend by order any decision made by it."

While we find no prejudice resulting from the treatment of the staff as an adverse party before the commission in this case, this opinion should not be read as generally approving a situation we regard as giving an appearance of impropriety. In other instances prejudice may be demonstrated to have resulted from this apparent conflict. For now, we will reserve judgment on the matter.

Affirmed.

HAYS, J., not participating.